UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG


NATHAN JOSEPH HUGHES,

        Movant,

v.                                    Case No. 6:07-cv-00702
                                      Case No. 6:04-cr-00127-4

UNITED STATES OF AMERICA,

        Respondent.


PROPOSED FINDINGS AND RECOMMENDATION

On November 5, 2007, Movant, Nathan J. Hughes (hereinafter "Defendant") filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (docket # 568), which was not signed.  By Order entered November 6, 2007, the court directed Defendant to submit a signed version by November 20, 2007, and granted him additional time in which to file a memorandum (# 576).  Defendant filed a signed § 2255 motion (# 581); the signature is dated November 8, 2007.  There are two postmarks on the envelope; one indicates November 28, 2007, and the other shows November 30, 2007.  The Clerk received it on December 3, 2007.  Defendant sought (# 582) and obtained (# 601) another extension of time to file his memorandum.[1]

Defendant finally filed his memorandum on December 8, 2008 (#

_____

[1] Defendant's requests for extension were prompted by his housing assignment and transfers among institutions, during which he lacked access to prison law libraries.

599).   The United States filed a response in opposition (# 603).
Defendant did not file a reply, but he filed two motions to alter/
amend pleadings (## 605, 609), and a motion to expand the record (#
608).   The undersigned will address the documents in the order in
which they were filed.

Defendant and two of his three co-defendants were convicted by
a jury of various offenses relating to the distribution of cocaine.
Defendant was convicted of engaging in a conspiracy to distribute
500 grams or more of cocaine, in violation of 21 U.S.C. § 846
(Count One), and distribution of 1.1 grams of cocaine (Count
Seven).   (Superseding indictment, # 105; jury verdict, # 243).   He
is serving a sentence of 140 months, to be followed by a five year
term of supervised release (Judgment Order entered April 27, 2005,
# 350).

Defendant's direct appeal was unsuccessful.   United States v.
Hughes, No. 05-449, 199 Fed. Appx. 250 (4th Cir. July 20, 2006),
cert. denied, 549 U.S. 1069 (Nov. 27, 2006).

## Facts of the Case

The Fourth Circuit's decision affirming Defendant's and co-
defendant Lois King's convictions and sentences provides a brief
synopsis of the government's evidence against Defendant:

> The charges arose in 2001 when the Drug Enforcement
> Administration and the Parkersburg Narcotics Violent
> Crimes Task Force ("Task Force") began an undercover
> investigation into cocaine trafficking in Wood County,
> West Virginia, targeting various individuals in the
> Parkersburg area including Appellant Hughes, as well as

2

Kirt King and others. [Footnote: The Government introduced evidence at trial that Kirt King and Mario Mason joined forces to purchase cocaine from Columbus, Ohio, process it, and then resell it in the Parkersburg, West Virginia area. Testimony as to the amounts of cocaine purchased, processed, and redistributed by the conspiracy members was introduced by a number of witnesses.] The evidence at trial revealed that the Task Force used Michelle Bailey, an exotic dancer, to make a controlled purchase of [1.1 grams of] cocaine from Hughes.  * * *

Sherman King testified that on several occasions he saw Hughes at Kirt King's residence, and saw Hughes give Kirt King money and later leave with a bag. Mario ["Marty"} Mason testified that Hughes spent time at Kirt King's house and that he personally had seen Hughes sell cocaine.  Curtis Richards testified that he also saw Hughes at Kirt King's house on several occasions, and that Hughes and King would go off together into a different room.  Stephen Gandee, a co-conspirator, testified that he saw Hughes at Kirt King's residence, that he had distributed cocaine with Hughes at a bar in Parkersburg, and that he had overheard a conversation at the Carter County Correctional Center between Hughes and Kirt King about Hughes still owing King $1400.

Hughes, 199 Fed. Appx. at 251-52.

The opening statements, evidence, and closing arguments heard by the jury about Nathan Hughes are set forth below.

*Opening statement by the United States:*

May it please the Court, fellow counsel, ladies and gentlemen of the jury, in 1995 until June of this year the defendant, Kirt King, sold multiple, multiple ounces of cocaine here in Parkersburg.  So big was his business that he had others selling with him.  Two of those are seated at counsel table as well, Nathan Hughes and Dane Mason.  (# 303, at 81-82.) * * *

You'll hear testimony that with regard to the defendant Nathan Hughes, there was in March of this year a controlled purchase from him using a confidential informant.  And you will hear evidence about that.  Id., at 88-89.

3

*Opening statement by Mr. Dascoli:*

        * * * Specifically with regard to Nathan Hughes, Nathan
Hughes is a lifelong resident of Wood County.  He's from
Parkersburg.  He attended Parkersburg High School. * * * [H]e
is a person that comes from a family who has his own hopes and
dreams for his son and, wishes the best for his parents. * *
* [O]ne of the persons you're going to hear from that is going
to talk and say things about Nathan Hughes is going to be
Michelle Bailey, who has a criminal record, who is a drug
addict, who is a thief. * * * You heard the one count about
the 1.1 grams that occurred in an alleged controlled buy in
March of this year, 1.1 grams of coke, okay, and a substantive
count.  That's indictment number seven.  Now think about that,
for instance.   And, of course, that's just a charging
instrument.   They have not proved that yet.   But the
Government's going to have to go from that to proving 500
grams in the conspiracy where my client had agreed to sell
that. * * * Also if you take a look at the conspiracy count,
Count One, it talks about the length of the conspiracy.  Okay?
Look, look at the date.  And I believe it's from 1995 to 2004.
* * * Now, ask yourself, as the Government comes forward with
its evidence, what part of that time period were they talking
about Nathan Hughes?  Remember that.  And then when you hear
the  Government's  witnesses,  ask  yourself,  where  is  the
agreement that Nathan was a part of to sell cocaine? * * *
<u>Id.</u>, at 103-12.

*Cross-examination of Nicole Montgomery by Mr. Dascoli:*

    Q.  You're not here to talk about Nathan Hughes, are you?
    A.  No.
    Q.  Okay.  Now, did I glean from your direct testimony that
    you actually – you're not here testifying under oath that you
    actually saw anything illegal being done; is that correct?
    A.  That's correct.  <u>Id.</u>, at 130.

*Direct examination of Mary Francis Longfellow by AUSA McVey:*

    Q.  How about Nathan Hughes?  Are you familiar with him?
    A.  Never heard of him.  <u>Id.</u>, at 162.

*Cross-examination of DEA Agent Robert Negro by Mr. Dascoli:*

    Q.  You have no knowledge about Nathan Hughes, correct, in
    terms of his controlled buy as far as your investigation
    activities are concerned; correct?  You've read documents, but
    you weren't –

4

A.  I've participated in debriefings.  I've read the documents relative to Mr. Hughes, but I was not present at the actual transaction that you're referring to. * * *
Q.  You did not see Nathan Hughes do anything illegal.  Is that a correct statement?
A.  No, I did not personally observe [Mr. Hughes]. * * *
Q.  So, you did not observe Nathan Hughes participate in any of the activity?
THE COURT: The answer is, no, he did not.  Id., at 194-95.

*Direct examination of Mario ["Marty"] Mason by AUSA McVey:*

Q.  Do you also know Nathan Hughes?
A.  Yes, sir.
Q.  How do you know him?
A.  Just hanging out –
Q.  Okay.
A.  – here and there.
Q.  Where would you hang out with Nathan Hughes?
A.  Kirt King's house.
Q.  Okay.  How often would you be at Kirt King's house during the course of say a week's time?
A.  I'd say like two to three times.
Q.  All right.  And would it be unusual to see Nathan Hughes there?
A.  I mean, he wasn't there like, just like five days or six days out of the week.  I mean, two or three times.
Q.  Okay.  Do you know whether or not Nathan Hughes ever sold cocaine?
A.  I never seen him sell any cocaine.
Q.  Okay.  Do you ever see Nathan Hughes buying cocaine?
A.  No, I never seen him have any cocaine.  (# 304, at 5-6.)

*Direct examination of Sherman King by AUSA Arnold:*

Q.  Do you know the defendant Nathan Hughes?
A.  Yes. * * *
Q.  Would you ever see the defendant, Nathan Hughes, at your brother, Kirt King's home?
A.  Yes.
Q.   When did you first start seeing him at your brother's home?
A.  It was mainly late at night. * * * The last year or so. * * *
Q.  Do you ever see your brother sell Nathan Hughes cocaine? * * *
A.  I seen him leave with bags and also give money ahead of time.  But as far as knowing that that was what was in the bag

5

Q.  Okay.  All I want to know is what you saw.
A.  Okay.  I saw them – I've seen a couple of occasions him come to the house late at night and get a bag and leave.
Q.  Okay.  Did you see Nathan Hughes with money?
A.  Yes.
Q.  When he came to the house, would he have a bag?
A.  No.
Q.  When he left the house, would he have a bag?
A.  Sometimes.  A lot of times, if I can elaborate – I don't know if you want me to.  A lot of times when I saw him late at night, the reason for that was his girlfriend was there with Shannon and he always had the assumption that somebody was cheating on her.  So, that's when I saw him there.  Id., at 73-75.

*Cross-examination of Sherman King by Mr. Dascoli:*

Q.  * * *  Is it your testimony today that you never saw Nathan Hughes sell cocaine?  Is that a correct statement?
A.  I – other than to me.  * * *
Q.  Because your testimony to her - your response to her, to Susan Arnold's question was you never saw Nathan Hughes sell cocaine.  Is that a correct statement?
A.  Yes, sir.  Id., at 84-85.

*Re-direct examination of Sherman King by AUSA Arnold:*

Q.  With regard to Nathan Hughes, were you in the Carter County Jail with him after being arrested on this charge?
A.  Yes.
Q.  Did Mr. Hughes make any statements to you regarding cocaine at that time?
A.  Yes.
Q.  What did he tell you?
A.  He had cocaine and money hidden that he threw off the side of the road.  * * *
Q.  Did he tell you how much money had had?
A.  He said anywhere from thirty to $100,000.
Q.  Did he tell you how much cocaine he had?
A.  I believe it was 13 ounces.
Q.  And you said he threw it off the side of the road?
A.  The day of the raid.
Q.  Why did he do that?
A.  He got scared that he was going to be caught too.  Id., at 149.

*Re-cross-examination of Sherman King by Mr. Dascoli:*

6

Q.   Mr. King, did you ever see Nathan Hughes with the 13 ounces that you said that he threw away?
A.   No.
Q.   You didn't see him involved in any of that activity, did you?
A.   No.  Id., at 155.

*Direct examination of Curtis Richards by AUSA Arnold*:

Q.   What would you observe when other people would come to Kirt King's house?
A.   They'd just come by and say something to him.  Then they'd go off where they weren't visible, and then they'd come back.
Q.   Do you know a Nathan Hughes?
A.   I know who he is, yes.
Q.   Did you ever see him at Kirt King's home?
A.   Yes.
Q.   Did you ever see him go off with Kirt King to a different room?
A.   Yes.
Q.   How many occasions?
A.   I'm not sure.  It was several times.  Id., at 191.

*Direct examination of Michelle Bailey by AUSA McVey*:

Q.   During the times that, or during the time that you were with Kirt King the second time, could you tell us whether or not he told you anything about his cocaine business?
A.   He talked a little bit about it.
Q.   What did he tell you?
A.   He talked about how much he sold his ounces for, and he talked about some of his friends, people that he dealt with.
Q.   And who were those people that he told you he dealt with?
A.   * * * Then there was Nate. * * * Nate Hughes.  Id., at 207-08. * * *
Q.   If I could direct your attention to March 10 of 2004 and ask if you had an occasion to work as a CI and make a purchase from Nate Hughes. [Testimony about controlled buy.]  Id., at 214-22.
Q.   Had you had any conversations with Nathan Hughes as to where he got his cocaine?
A.   Not that I remember.  Id., at 222.

*Direct examination of Steve Gandee by AUSA Arnold*:

Q.   Do you know Nathan Hughes?
A.   Yes.
Q.   How long have you known Nathan Hughes?

A.   Since elementary school.
Q.   Have you ever seen Nathan Hughes at Kirt's?
A.   Yes.
Q.   On how many occasions?
A.   Just like once.
Q.   On the occasion that you saw him at Kirt's, what was he doing.
A.   They was all just sitting around talking.
Q.   Did you ever see Nathan Hughes with money at Kirt's?
A.   No.
Q.   Did you ever see him with drugs at Kirt's?
A.   No.
Q.   Did you ever see him interact with Kirt?
A.   No.
Q.   Do you have personal knowledge of Nathan Hughes selling cocaine?
A.   Yes.
Q.   How?
A.   Just – I've did it with him.
Q.   On what occasion?
A.   At the bar one time.
Q.   Did you see him selling . . . to other people?
A.   No.
Q.   Did you see him sharing with other people?
A.   Yeah.
Q.   Do you remember how much it was?
A.   No.
Q.   Mr. Gandee, after the search warrants were executed at Kirt King's residence, were you arrested?
A.   Yes.
Q.   Were you incarcerated in the Carter County Jail?
A.   Yes.
Q.   Who was incarcerated with you there?
A.   It was me, Sherman [King], Nathan, Dane [Mason], Marty [Mason], and Kirt [King].
Q.   Did you overhear Mr. King making any comments to Mr. Hughes about money?
A.   Yeah.
Q.   What did he say?
A.   Something about that he still owed him $1,400.  Id., at 255-57.

**Grounds for Relief**

The original unsigned § 2255 motion sets forth the following grounds for relief:

8

Ground one: The district court lacked jurisdiction of
this case.
Ground two: Prosecutorial misconduct.
Ground three: Ineffective assistance of counsel.
    1.   Counsel failed to file a Fed. R. Crim.
Proc. 12(b)(3)(B) motion to dismiss the
indictment.
    2.   Counsel failed to adequately prepare for
trial.
    3.   Counsel existed under a conflict of
interest.
    4.   Counsel failed to object to the
introduction of evidence.
    5.   Counsel failed to object to the court's
jury instructions.
    6.   Counsel failed to properly file a Fed. R.
Crim. Proc. 29 motion.
    7.   Counsel failed to properly file a Fed. R.
Crim. Proc. 33 motion.
Ground four: Ineffective assistance of appellate counsel.

(# 568, at 7-8.)  No legal argument or further elaboration is provided for these grounds.  The signed version (# 581) presents identical grounds but, again, with no argument or elaboration.

Defendant's long-delayed memorandum (# 599) dropped the first ground (lack of jurisdiction), and it will not be considered further.  The memorandum provides substantial argument and detail concerning the other grounds for relief and they will be addressed in order.

Defendant's first motion to alter/amend pleadings (# 605, filed on March 9, 2009, signed on February 27, 2009) seeks to add an eighth specific allegation to his second ground for relief, ineffective assistance of counsel.  The eighth specific allegation is that his counsel denied him the right to testify on his own behalf.

Defendant's second motion to alter/amend pleadings (# 609, filed on March 30, 2009, signed on March 24, 2009) argues that the jury was instructed on 500 grams or more of cocaine, but at sentencing, Defendant was held responsible for more than 47 kilograms of cocaine.  He asserts that his attorney was ineffective for failing to object to the jury instructions and to the increased relevant conduct.  The undersigned notes that at the sentencing of Kirt King on June 16, 2005, the government dropped the amount to 46 kilograms, explaining that the difference "may be a mathematical error."  (Tr. Disp. Hrng, # 478, at 5.)

**Analysis**

<u>Ground two - Prosecutorial misconduct</u>

Defendant asserts that the government engaged in misconduct because it "presented evidence of multiple conspiracies, at best, when it presented its case and this deprived him of his rights to due process of law."  (# 599, at 5.)  He contends that the first conspiracy was the agreement between Kirt King and Mario Mason to pool their money, purchase cocaine in Columbus, Ohio, transport it back to Parkersburg, West Virginia, "cut" it with an inert ingredient, divide it, and "go their separate ways."  <u>Id.</u>  The second conspiracy, he suggests, was Defendant's use and sale of cocaine.  <u>Id.</u>  He argues that the government failed to establish that Defendant's role assisted the first conspiracy; the prosecution "simply put witnesses on that would tend to show that

10

Hughes bought drugs from King." _Id._  He asserts that Steve Gandee's statement relating to the $1,400 debt was not reliable because there was no evidence that King fronted drugs to Defendant. _Id._  Defendant's position is that the United States violated his right to due process of law because the government knew that he was not part of the King/Mason conspiracy. _Id._, at 7.

The government responds generally that issues raised on direct appeal cannot be relitigated on collateral review, and that "the only objections properly raised on direct appeal were rejected by the . . . Fourth Circuit." (# 603, at 5-6, 10-11.)  The United States does not directly address Defendant's assertion of proof of multiple conspiracies.

One of the issues raised on direct appeal by Defendant was sufficiency of the evidence based on the suspect credibility of the witnesses. _Hughes_, 199 Fed. Appx. at 252.  The appellate brief filed on Defendant's behalf argued as follows:

> There was insufficient credible evidence to prove that Appellant Hughes was guilty of conspiracy as charged in Count One of the Indictment when the Government's evidence consisted of testimony of informers and an individual who acknowledged being motivated by perceived grudge. A review of the trial evidence shows that witnesses were biased and unreliable.

Brief of Appellants, 2005 WL 3691235, at 20 (Dec. 22, 2005).  This argument does not raise an issue as to single versus multiple conspiracies, and the government's citation to _Boeckenhaupt v. United States_, 537 F.2d 1182, 1183 (4th Cir. 1976), is inapt.

The Fourth Circuit has ruled that for there to be evidence of multiple conspiracies, the proof at trial must demonstrate that the defendant was involved only in a separate conspiracy unrelated to the overall conspiracy charged in the indictment. United States v. Kennedy, 32 F.3d 876, 884 (4th Cir. 1994). "A single conspiracy exists where there is 'one overall agreement,' or 'one general business venture.' Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988).

The superseding indictment charged that the purpose of the conspiracy, from 1995 until 2004, at Parkersburg, West Virginia, was "knowingly and intentionally to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine." (# 105, at 1-2.) The government's burden of proof was to demonstrate beyond a reasonable doubt that the defendants agreed to violate the federal drug laws by distributing cocaine, that Nathan Hughes knew of the conspiracy, and that Hughes deliberately and willingly joined and participated in it. United States v. Strickland, 245 F.3d 384-85 (4th Cir. 2001). Review of the transcript reveals that the United States produced some evidence of Defendant's knowledge of the conspiracy to distribute cocaine and his joinder and participation in it. While Defendant may not have been a major player in the drug conspiracy, "[o]nce it has been

12

shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir. 1992).

The undersigned proposes that the presiding District Judge **FIND** that there was no evidence that Defendant was involved in a separate conspiracy unrelated to the overall conspiracy charged in the indictment, that Defendant's due process rights were not violated, and that the United States did not engage in prosecutorial misconduct in this respect.

Ground three - Ineffective Assistance of Trial Counsel

Defendant was represented throughout the trial proceedings by Carl A. Dascoli, an experienced attorney who was appointed pursuant to the Criminal Justice Act.

The Supreme Court addressed the right to effective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984), in which the Court adopted a two-pronged test. The first prong is competence; movant must show that the representation fell below an objective standard of reasonableness. Id., at 687-91. There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing court must be highly deferential in scrutinizing the performance of counsel. Id., at 688-89.

In order to meet the first prong, movant must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The

13

court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id., at 690.

The second prong is prejudice; "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694. The court may determine the prejudice prong prior to considering the competency prong if it is easier to dispose of the claim on the ground of lack of prejudice. Id., at 697.

### 1. Failure to file motion to dismiss the indictment

This alleged omission of counsel is not discussed in Defendant's memorandum; the undersigned will not address it further.

### 2. Failure to prepare for trial

Defendant contends that he was denied effective assistance of counsel in three respects: (a) his attorney failed to investigate and call witnesses material to his case; (b) counsel failed to request a severance; and (c) his lawyer failed to take notice of an adequate defense.

### Witnesses

Defendant asserts that Shannon O'Rourke (girlfriend of Kirt

14

King) and Rebecca Allen (Defendant's girlfriend) would have testified that whenever Defendant went to Kirt King's house, it was for the sole purpose of taking Ms. Allen to visit Ms. O'Rourke. (# 599, at 9.)    At his sentencing, Defendant expressed his disappointment that Mr. Dascoli had not called the two women as witnesses at trial.   (Tr. Disp. Hrng, # 406, at 20-23.)   The witnesses were present at the sentencing hearing, so Judge Goodwin took a recess to permit Mr. Dascoli to interview the witnesses. Id., at 25-26.   Mr. Dascoli informed the court that Shannon O'Rourke had declared that she did not want to testify and had left.   Id., at 26.   Rebecca Allen was called to the stand and testified that Nathan Hughes is her boyfriend.   Id., at 28.   She stated that Nathan Hughes was going over to Kirt King's house because she was going there on a regular basis to visit Kirt's girlfriend, Shannon O'Rourke.   Id., at 29.   The visits occurred from late 2003 to June, 2004, when the men were arrested.   Id., at 29-30.   The only drug activity she observed at Kirt King's house was smoking pot.   Id., at 30.   She concluded her testimony by stating that Sherman King (who testified at trial) doesn't care for Nathan Hughes.   Id., at 31.

The United States failed to respond specifically to any of the allegations of ineffective assistance of counsel raised by Defendant.

An allegation that an attorney conducted an inadequate

investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out.  See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1991).  Furthermore, the reasonableness of an investigation made by counsel must be evaluated under the totality of the circumstances facing the attorney, appreciating "the practical limitations and tactical decisions that trial counsel faced."  See Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991).  "Particularly when evaluating decisions not to investigate further, we must regard counsel's choices with an eye for 'reasonableness in all the circumstances, applying a heavy measure of deference for counsel's judgments.'"  Id. (quoting Strickland, 466 U.S. at 691.)  Finally, there is an important distinction between, on the one hand, alibi witnesses and eyewitnesses critical to the determination of guilt and, on the other hand, witnesses whose appearance is desired by the accused.  Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998).

Defendant has failed to show that the lack of Shannon O'Rourke's and Rebecca Allen's testimony at trial prejudiced his defense to the extent that the outcome of the trial would likely have been different.  Witness Sherman King testified that he saw Nathan Hughes at Kirt King's house late at night because Hughes' girlfriend "was there with Shannon and [Hughes] always had the assumption that somebody was cheating on her." (Tr. Trial, # 282,

16

at 74.)   Thus the jury heard some testimony concerning the reason
that Nathan Hughes was at Kirt King's residence.   Rebecca Allen
stated that she did not witness drug trafficking activity; however,
the testimony of Curtis Richards established that Defendant and
Kirt King would "go off together into a different room." Hughes,
199 Fed. Appx. at 252.   Sherman King testified that he witnessed
Defendant giving Kirt King money, and Defendant leaving King's
residence with a bag. Id.   Given that drug trafficking activity is
necessarily and usually covert, it is of little significance that
Rebecca Allen did not witness drug transactions between her
boyfriend and Kirt King.   Accordingly, the undersigned proposes
that the presiding District Judge **FIND** that Defendant was not
prejudiced by Mr. Dascoli's failure to call Rebecca Allen and
Shannon O'Rourke as witnesses at the trial.   The undersigned notes
that the testimony of Rebecca Allen and Shannon O'Rourke would have
had more impact if Kirt King had testified at trial (see section
below on Rule 33 and newly discovered evidence).

Request a Severance

Defendant contends that he was denied effective assistance of
counsel when his attorney failed to move for a severance because
"the defense of his case was so dynamically different from that of
[Kirt] King's."   (# 599, at 11.)   His argument is based on the
thesis that the conspiracy was only between Kirt King and Mario
Mason who agreed to pool their money, go to Columbus, obtain

cocaine, return to Parkersburg, process it, divide it and go their separate ways.  Id., at 14-17.  Defendant claims that he had no part or knowledge of such conspiracy.  Id., at 17.  Defendant concedes that Sherman King and Curtis Richards testified that Hughes obtained cocaine from King, which he claims was a buyer/seller relationship, not co-conspirators.  Id.

As noted above in the section on single versus multiple conspiracies, the conspiracy charged in the indictment was to distribute cocaine in Parkersburg, not to drive to Columbus.  When an individual willfully joins the unlawful purpose of a conspiracy, he is held responsible for the reasonably foreseeable actions taken by the co-conspirators.  Defendant's claim is basically an attempt to re-write the purpose of the conspiracy.

As Defendant himself has noted, defendants indicted together should be tried together, especially in conspiracy cases.  United States v. Harris, 498 F.3d 278, 291 (4th Cir. 2007).  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Defendant was not denied effective assistance of counsel when Mr. Dascoli failed to file a motion to sever Defendant's case from his co-defendants.

### Take Notice of Adequate Defense

It appears that this claim is a variation of Defendant's claims with respect to single versus multiple conspiracies and the failure to file a motion to sever.  Defendant's entire argument on

18

this claim reads as follows [spelling corrected]:

> Hughes avers that counsel provided ineffective assistance of counsel when he failed to take notice of an adequate defense, namely the defense where counsel concedes that there did in fact exist a conspiracy between Mason and King, but that he was not a part of that agreement; hence that conspiracy.

(# 599, at 18.)

For the reasons set forth above, the undersigned proposes that the presiding District Judge **FIND** that Mr. Dascoli was not ineffective with respect to his preparation for trial.

### 3.  Alleged conflict of interest

This allegation is not discussed in Defendant's memorandum; the undersigned will not address it further.

### 4.  Failure to object to evidence

This alleged omission of counsel is not discussed in Defendant's memorandum; the undersigned will not address it further.

### 5.  Failure to object to jury instructions

Defendant contends that he was denied effective assistance of counsel because Mr. Dascoli failed to object to the jury instructions relating to drug conspiracies. (# 599, at 19-24.) In particular, he argues that the instructions were inconsistent with the Fourth Circuit's ruling in United States v. Collins, 415 F.3d 304 (4th Cir. 2005). Id., at 21.

As noted above, the government did not respond specifically to any of Defendant's claims of ineffective assistance of trial

counsel.

Defendant's trial took place from November 30 through December 3, 2004.  United States v. Collins, in which the Fourth Circuit ruled that a defendant's Sixth Amendment right to trial by jury was violated by imposition of a sentence based on the quantity of cocaine base distributed by the entire conspiracy, without the jury's determination of the amount of drugs attributable to the particular defendant, was decided July 12, 2005, seven months after the trial was concluded.  Thus when the jury was instructed in Defendant's case, there was no predicate to require an instruction under Collins, and Defendant was not denied effective assistance by his trial counsel.  The instructions given in early December, 2004, were correct.

The undersigned proposes that the presiding District Judge **FIND** that Mr. Dascoli was not ineffective when he failed to object to the jury instructions.

### 6. Failure to make Rule 29 motion

Defendant argues that Mr. Dascoli "failed to properly move the Court, prior to the returning of the jury's verdict or after the returning of the verdict, for a judgment of acquittal, pursuant to Rule 29."  (# 599, at 25.)  The transcript of the trial reflects that Mr. Dascoli did make such a motion at the close of the government's case, and argued as follows:

> I would make an oral motion to the Court
> respectfully that the Government has not come close to

proving the conspiracy as it relates to Nathan Hughes in Count One of the indictment.

Certainly, there's been no evidence submitted to the jury for the province of the jury to consider with regard to at least 500 grams with regard to Nathan Hughes and the alleged conspiracy with regard to Count One.

I believe one of the witnesses did briefly mention that he had overheard Nathan Hughes talk about, while they were in jail in Carter County, referencing 13 ounces, but that was it. That was just a jail conversation that he said he overheard Nathan Hughes talk about.

Well, let's take the 13 ounces. 13 times 28 is 304. That's less than 500 grams. And even if you were, even if the jury thought that this informant or this witness was believable, if we take this person at his word, we don't get close to 500 grams, Your Honor, respectfully.

Now, there is more evidence that's been submitted to the jury by the Government with regard to Count Seven in the controlled buy. Of course, there's the tape and such, and there's the testimony of Michelle Bailey. And certainly, of course, we would argue that that's not conclusive that a controlled buy actually occurred. But I'll save that argument later for the jury.

But certainly with regard to Count One, I mean, witness after witness after witness didn't even mention Nathan Hughes's name, let alone talk about the case manager [sic; agent], Doug Sturm, who is in charge of this whole deal for the Government as the investigative officer did not mention one word with regard to Nathan Hughes as it pertains to a conspiracy, Your Honor. I mean, zero evidence.

Agent Negro talked briefly about the chain of custody, but he gave no evidence with regard to Nathan Hughes involved in the conspiracy, nor did any other officer that was presented, none of the CIs, no one. There's nothing there.

(Tr. Trial, # 305-5, at 227-28.)  The government responded:

MR. McVEY: Your Honor, first off with regard to the amounts, the United States does not have to prove that

21

Nathan Hughes actually sold 500 grams, as the Court's well aware.  I think there's ample evidence that this conspiracy involved more than 500 grams.

With regards specifically to Nathan Hughes's involvement, certainly considering the jailhouse statement that came in in the light most favorable to the United States would show his involvement in that conspiracy, as does evidence that was introduced that would certainly show Nathan Hughes was involved with that.

Sherman King testified that he would see Nathan Hughes come into the house, give his brother money, and then leave with a bag.  We know that he had been selling cocaine.  Sherman King has purchased from him.  Curtis Richards saw Nathan Hughes go off into a different room, as was the pattern for drug sales in that house.

Based on that, looking at the evidence in the light most favorable to the United States, I believe that would show circumstantially that the defendant, Nathan Hughes, is involved in the conspiracy.

Id., at 228-29.

MR. DASCOLI: Your Honor, on a good day, on a very good day for the Government, circumstantial at best. Going into rooms of other people is not sufficient to take this to a jury where Nathan Hughes is exposed to 5 to 40 years on a conspiracy to be part of selling at least 500 grams of cocaine.  It's not there, witness after witness.

If there's any case at all that the Government's produced with regard to Nathan Hughes, if I'm going to be straightforward with the Court, would be regarding Counsel Seven which will be left for arguments.  But as far as the conspiracy is concerned, I mean, it is, it's beyond weak.  I mean, it is tenuous.  It's — I have nothing further, Your Honor.

Id., at 229.

THE COURT: There's testimony that on the day of the raid Nathan Hughes had money and cocaine which he threw out to the side of the road, thirty to a hundred thousand dollars worth.

> Steve Gandee, Jr., testified that Kirt said that Nathan owed him $1,400. There was the testimony about him going into the room and coming out. There was the testimony of Sherman King about him getting money, getting a bag and leaving, and the testimony that Mr. Sherman King observed him selling cocaine.
>
> And taken in the light most favorable to the Government, your motion is denied.

Id., at 229-30.

Defendant may be arguing that his attorney was ineffective because the substance of his argument was in error. Defendant asserts again his theory of single vs. multiple conspiracies, contending that the evidence showed either a buyer/seller relationship, or separate conspiracies. (# 599, at 25-29.) For the reasons stated above, the undersigned finds Defendant's contentions in this regard to be unpersuasive.

The undersigned proposes that the presiding District Judge **FIND** that Mr. Dascoli was not ineffective with respect to his Rule 29 motion.

### 7. Failure to make Rule 33 motion

Defendant asserts that Mr. Dascoli was ineffective when he failed to move for a new trial based on newly discovered evidence which came out at the sentencing hearing on April 25, 2005.[2] The newly discovered evidence is the testimony of Rebecca Allen that she did not see drug trafficking activity at Kirt King's house, and

---

[2] On December 9, 2004, Mr. Dascoli filed a post-verdict motion for judgment of acquittal and alternatively motion for new trial, based on asserted insufficiency of the evidence (# 249). It was denied by Order entered December 16, 2004 (# 265).

23

a letter to Judge Goodwin from Kirt King (Defendant's Exhibit 2). The letter from Kirt King reads, in pertinent part, as follows [spelling corrected]:

> I'm writing this letter because I got a letter today saying that my court date has been pushed back and there is many things I wanted to say before everyone got sentenced. * * * [Statements regarding money-laundering charges and his mother omitted.]
>
> Also I wanted you to be aware that I have never dealt with Nathan Hughes. I tried to say this when I stood up and talked before trial started but I was unable to say everything I wanted to say. The only reason he was at my house was because my girlfriend and his girlfriend were hanging out together and he was always looking for her. Also, I thought my girlfriend Shannon and his Becca was going to testify to this at trial but they were not called to and I don't know why. I was wanting to say all these things at sentencing and a whole lot more because I feel if I had been given the chance to tell the truth everyone in this case would have had a different sentence. They have given people in this case pleas and they lied. I'm not saying all of it was lies but a lot of it was. I'm not saying I'm completely innocent, but I'm nowhere near the person they have made me out to be. I'm sorry to bother you. Thank you very much for your time. Sincerely, /s/ Kirt King

In <u>United States v. Chavis</u>, 880 F.2d 788, 793 (4th Cir. 1989), the Fourth Circuit confirmed its use of a five-prong test to determine whether a new trial should be granted on the basis of newly discovered evidence:

> (i) is the evidence, in fact, newly discovered; (ii) are facts alleged from which the court may infer due diligence on the part of the movant; (iii) is the evidence relied upon not merely cumulative or impeaching; (iv) is the evidence material to the issues involved; and (v) would the evidence probably result in acquittal at a new trial? *United States v. Bales*, 813 F.2d 1289, 1295 (4th Cir. 1987). Unless the answer to each of these inquiries is affirmative, a new trial is not appropriate.

24

Defendant's claim is raised in the context of ineffective assistance of counsel, not as a motion for new trial under Rule 33. Accordingly, the undersigned will address whether it was outside the wide range of professionally competent assistance not to move for a new trial when Mr. Dascoli learned of the new evidence.

Rebecca Allen's testimony was apparently "new" to Defendant's attorney, but it was not new to Defendant.  At the sentencing hearing, Defendant complained that he had asked Mr. Dascoli to call Ms. Allen and Ms. O'Rourke to testify during the trial, to no avail.  (Tr. Disp. Hrng., # 406, at 20-23.)  The court has addressed above Mr. Dascoli's failure to call the witnesses Shannon O'Rourke and Rebecca Allen to testify at trial and will not consider it further here, although the court notes that their testimony has greater probative value when combined with Kirt King's testimony.

The letter of Kirt King exculpating Nathan Hughes, and Kirt King's apparent willingness to testify to this effect, comprised decidedly new evidence.  As a co-defendant, Kirt King was not an available witness to Defendant, and King's attorney surely would have resisted his client's taking the stand to exculpate Hughes but thereby exposing himself to cross-examination by the prosecution. The undersigned has found nothing in the record to suggest that Kirt King had previously indicated a desire to testify for Hughes. There is no indication that Defendant knew of Kirt King's

willingness to exonerate Hughes prior to Hughes' sentencing; thus the undersigned infers due diligence on the part of Defendant. Kirt King's evidence is neither cumulative nor impeaching, as there was only circumstantial evidence of Defendant's participation in the drug conspiracy.  No person testified as an eyewitness to any drug transaction between Kirt King and Nathan Hughes.  King's evidence is definitely material to the issue involved, i.e., whether Nathan Hughes willfully join the charged drug conspiracy. The fifth <u>Chavis</u> factor, whether the evidence would probably result in acquittal at a new trial, is the most difficult to assess because King's credibility has not been tested.  At a new trial at which Nathan Hughes is the lone defendant, Kirt King's candid testimony that King engaged in a significant drug conspiracy, but that Hughes was not a participant, and that Hughes' presence at King's house had a legal purpose, as corroborated by Rebecca Allen and Shannon O'Rourke, would probably be persuasive.

The evidence of Kirt King's willingness to testify to exculpate Hughes is not limited to his hand-written letter.  At his own sentencing, which took place on June 16, 2005, Kirt King, having been placed under oath, stated as follows in his allocution:

> And also I think if I were to get on the stand and testified at trial I think things would have been different for my mom and for Nathan Hughes.  I've never dealt with Nathan Hughes before, never dealt drugs.  The only reason he was coming to my house was him and my girlfriend were drinking and hanging out together.  But me and him dealing drugs, not even marijuana, no marijuana, no cocaine.   We did absolutely nothing

together.

The only reason he was there was he was basically crazy about his girlfriend and was wanting to make sure she wasn't cheating on him. That's why he started coming around the last three months to see what she was going to do.

* * *

THE COURT: I've heard a lot of things from you today that I didn't hear at the trial, obviously.

THE DEFENDANT: Yeah. I regret every day not getting up and testifying. I believe Nathan Hughes's sentence would have been different. I believe he would have went home.

From what I seen in our discovery, maybe he wouldn't have went home on the 1.1 gram, but on the conspiracy with me, I think if I would have stood up and said what I had to say, I believe he would have went home, did his time for his gram, and he wouldn't be facing nowhere near what he got.

(Tr. Disp. Hrng, # 478, at 25-26.)  The United States did not respond to King's statement.  Id., at 27.

The American Bar Association's Standards for Criminal Justice, Prosecution and Defense Function, 3d ed., includes Defense Function Standard 4-7.9, which provides that "[d]efense counsel's responsibility includes presenting appropriate posttrial motions to protect the defendant's rights."

The evidence against Nathan Hughes was decidedly thin.  During the argument on Mr. Dascoli's Rule 29 motion, Mr. Dascoli, Mr. McVey, and Judge Goodwin recited the evidence against Hughes and Mr. Dascoli appropriately characterized it as circumstantial.

The undersigned proposes that the presiding District Judge

**FIND** that Kirt King's testimony constitutes newly discovered evidence which meets the <u>Chavis</u> five-prong test, that a post-sentencing motion for new trial was likely to be successful, and that the newly discovered evidence would probably have resulted in acquittal of Nathan Hughes on the conspiracy charge at a new trial. Inasmuch as Kirt King was the leader of the conspiracy, he was in the best position to know with whom he was conspiring. The undersigned further proposes that the presiding District Judge **FIND** that it was ineffective assistance of counsel for Mr. Dascoli not to seek a new trial when he learned of Kirt King's exculpation of Nathan Hughes, and that Nathan Hughes was prejudiced thereby.

### 8. Failure to permit Defendant to testify

In Defendant's first motion to alter/amend pleadings, he seeks to add a claim of ineffective assistance of counsel which is that Mr. Dascoli, "after badgering him, denied him the right" to testify in his own behalf. (# 605, at 3.) His affidavit states as follows:

> Prior to trial, I informed counsel that I wanted to testify on my own behalf so that I could inform the Court, and the jury, that I did not conspire with Kirt King to distribute drugs in the Southern District of West Virginia. I further wanted to inform the jury that I never purchased any drugs from him. Counsel immediately began to badger me, informing me in derogatory terms that I could not convince him that I was innocent, how could I possibly convince a jury? He told me to let him be the lawyer and he may possibly get me off.

(# 606, at 2.)

In a decision concerning this issue, the Fourth Circuit held:

28

> . . . the advice provided by a criminal defense lawyer on whether his clients should testify is "a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." <u>Hutchins v. Garrison</u>, 724 F.2d 1425, 1436 (4th Cir. 1983), <u>cert. denied</u>, 464 U.S. 1065, 104 S. Ct. 750, 79 L.Ed.2d 207 (1984); <u>see also</u> <u>Jones v. Murray</u>, 947 F.2d 1106, 1116 n.6 (4th Cir. 1991)(reiterating principle that advice to testify is paradigmatic of strategic decision); <u>Rogers-Bey v. Lane</u>, 896 F.2d 279, 283 (7th Cir. 1990)(concluding that counsel's advice not to testify based in part on erroneous belief that defendant could be impeached by prior conviction, was not deficient performance); <u>Reyes-Vejerano v. United States</u>, 117 F. Supp.2d 103, 108-09 (D.P.R. 2000)("Absent evidence of coercion, legal advice concerning the defendant's right to testify does not constitute [ineffective assistance of counsel]").

<u>Carter v. Lee</u>, 283 F.3d 240, 249 (4th Cir. 2002).

The undersigned proposes that the presiding District Judge **FIND** that Defendant has not shown evidence of coercion, and that Mr. Dascoli's tactical decision to discourage Defendant from testifying did not constitute ineffective assistance of counsel.

### 9. Failure to object to relevant conduct

Defendant asserts in his second motion to amend/alter pleadings that Mr. Dascoli was ineffective "for failing to object to these baled [sic] amounts." (# 609, at 2.) The court understands Defendant's term, "baled amounts," to refer to the relevant conduct of 47.1744 kilograms of cocaine which was attributed to him at sentencing. The undersigned has noted above that at Kirt King's sentencing, the government lowered the amount to 46 kilos, although the change in amount makes no difference to the applicable guideline range.

Contrary to Defendant's assertion, Mr. Dascoli did object to the drug quantity attributed to the conspiracy and to Defendant at sentencing.  The presentence report ("PSR") calculated the amount of cocaine involved in the conspiracy as follows:

9.  With respect to the defendant's conviction on the conspiracy offense as charged in Count One, Sherman King's testimony, which is substantiated by that of Michelle Bailey, is that Kirt King and Marty Mason typically pooled their money together to make weekly purchases of 16 ounces of cocaine for approximately one year from 2003 to 2004.  With a hydraulic press, Kirt King and Marty Mason had been taught how to convert 16 ounces of cocaine into 32 ounces of cocaine, thereby doubling their drug and doubling their profits.  The government estimates that the conspiracy involved an amount of 47.1744 kilograms of cocaine, which is based upon the information of Sherman King and Michelle Bailey and calculated as 907.2 grams per week x 52 weeks = 47,174.4 grams or 47.1744 kilograms of cocaine.  The probation officer believes the defendant is accountable for 47.1744 kilograms of cocaine and considers the following information developed from grand jury and jury trial testimony as evidence of the defendant's furtherance of the conspiracy.

10.  Sherman King testified that within the last one and one-half years, prior to the arrest of the defendant and other co-conspirators, he saw **Nathan Hughes** at Kirt King's resident on numerous occasions.  On some of those occasions, Sherman King said he observed **Mr. Hughes** come to Kirt King's residence and give Kirt money.  He would then see **Hughes** leave Kirt's residence with grocery bags.  According to Sherman King, after the arrest of the co-conspirators, he and **Nathan Hughes** were detained together at Carter County Detention Center in Grayson, Kentucky.  It was during that time that Sherman King said that **Nathan Hughes** told him that he had disposed of approximately $50,000 and 13 ounces of cocaine powder, after a law enforcement raid was conducted at the residences of Kirt and Lois King on June 2, 2004.  Sherman King reported that **Mr. Hughes** advised him he disposed of the money and drugs because he was afraid he would also get caught.

11.   Another cooperating co-conspirator, Stephen Gandee, testified that he had seen **Mr. Hughes** at the residence of Kirt King.   And, although Gandee had never seen **Mr. Hughes** selling cocaine, he had seen the defendant using the substance.   While he was detained at Carter County Detention Center with other co-conspirators, Mr. Gandee reported hearing Kirt King tell **Nathan Hughes** that **Hughes** still owed him $1,400.

12.   Another government witness, Curtis Richards, testified that he had observed **Mr. Hughes** at the residence of Kirt King.   During his observation, Mr. Richards saw the defendant and Kirt King go, alone, into another room together, which was consistent with how Mr. King conducted his drug transactions.

13.   Michelle Bailey, the confidential informant in Count Seven [1.1 gram], testified to having made prior purchases of cocaine from **Nathan Hughes**.   She also reported being told by Kirt King that he was **Mr. Hughes** source for cocaine and that **Hughes** was selling the cocaine he provided.

(PSR, ¶¶ 9-13, at 6-7.) [Emphasis in the original.]   The PSR included a two-level decrease in offense level based on Defendant's playing a "minor role."   Id., ¶ 22, at 8.   The report explained, "His only role in the furtherance of the conspiracy was to obtain cocaine from Kirt King for re-sale."   Id.

Mr. Dascoli objected to the relevant conduct of 47.1744 kilograms of cocaine, and argued that:

The amount of cocaine as assessed by the probation officer and the government was not foreseeable to this defendant and provides for a base offense level greater than that of 500 grams to 2 kilograms as stated in Count One.   Such a categorization is incongruous with the basic tenet of Booker, in that "any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

31

Id., at 18.  Mr. Dascoli also filed a sentencing memorandum, which states, in pertinent part, as follows:

> 3.   The pre-sentence report is dearth when establishing Nathan J. Hughes['] conduct as relevant and foreseeable to the conspiracy alleged by the Government. Specifically, paragraph Nine (9) of the report fails to establish a nexus between Nathan J. Hughes and the conduct of the alleged conspiracy when calculating the amounts attributable to the conspiracy and *ergo* to this defendant. Accordingly, the relevant conduct of 47,174.4 grams of cocaine calculated in paragraph (9) of the report is not relevant and/or foreseeable to Nathan J. Hughes.
>
> 4.   Paragraph Ten (10) of the report theoretically establishes conduct involving 364 grams of cocaine attributable to this defendant, triggering a base offense level of Twenty-Two (22).  The Government withdrew its criminal forfeiture against Nathan J. Hughes in the amount of $50,000.00, never corroborating the existence of $50,000.00 attributable to this defendant nor its origin.
>
> 5.   An alternative analysis of the offense conduct is that the amount established by the jury verdict relevant to the conduct involving this defendant equals the amount of 501.1 grams of cocaine under *United States v. Booker*, yielding a potential offense level of Twenty-Six (26), excluding a two level reduction recommended by the probation officer for occupying a minor role.  Any amount of cocaine attributable to this defendant exceeding those amounts establishing a *Level 26* countermands the ruling in *Booker* that "any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

(# 334, at 2.)

Mr. Dascoli's reference to the forfeiture proceeding (¶ 4 of his sentencing memorandum) provides a further indication of the government's lack of evidence of the quantity of cocaine which was

foreseeable to Defendant.   The forfeiture hearing took place on February 4, 2005.   Only Defendant and co-defendant Dane Mason disputed the forfeiture amount sought by the United States (# 309). The government sought $50,000 from Defendant.

MR. McVEY: Yes, Your Honor.   The amount sought against Nathan Hughes represents the money obtained during one controlled buy, as well as the money that was discussed by Sherman King that Nathan Hughes had thrown out of his car right before or right after the arrest on June, in June of last year.  I think the actual testimony at trial was between $30,000 and $100,000 and the Government will seek $50,000.

THE COURT: All right.  Mr. Dascoli.

MR. DASCOLI: Your Honor, we would not contest the amount derived from the controlled buy, but would contest the $50,000.  We understand respectfully, Your Honor, that the money judgment, the nexus is the amount foreseeable to the, to that defendant in this matter. And based on the jury verdict in this case, there's 500 grams of cocaine that was proved guilty by the jury, though, of course, my client respectfully maintains his innocence.

But if we go by the 500 grams in the conspiracy amount, that's in the verdict form, that's roughly . . . 17.8 ounces of cocaine.  And if you go by the figures used by the Government in its forfeiture motion, specifically it talks about Michelle Bailey being the cornerstone of the Government's basis to calculate a money judgment in this matter.  And she talks about, for instance, an individual who took 22 ounces and added substance to it and ended up with 44 ounces and resold if for, quote, $600, $800 per ounce.

If you were to take 17.8 ounces of cocaine and multiply it by $800 per ounce, we would arrive at a figure substantially less than $50,000.  We're looking at $14,285.71.  And that's using the calculations presented by the Government in its forfeiture motion respectfully, Your Honor.

The evidence about $50,000 in cash is sketchy at

best and we respectfully submit that it doesn't even meet the preponderance of the evidence standard.

If you look at the report generated by the Government with regard to its interview of Sherman King, I think if you read that report carefully, he talks about that he heard while in jail that Nathan Hughes had tossed $50,000 out of a car, but the report doesn't say that Sherman King heard that from my client himself, but that he had just heard that in the jail.

So, based on the fact that if we're going to look at a nexus and an amount that is foreseeable, let's respectfully take the 500 grams and then convert it.

THE COURT: We have to have a nexus between something and something. And I'd like to know what — I share your concern about whether or not there was money that we're forfeiting.

MR. DASCOLI: There was never $50,000 recovered from this car or this van that is alluded to in the Government's case, and there's no direct evidence to establish that. So, Your Honor, we would fall back to the amount of cocaine that is in the verdict.

* * *

THE COURT: I understand you[, Mr. Dascoli]. My suggestion is there is no thirty to fifty or a hundred thousand dollars thrown out the window to forfeit, is there? Where is it?

MR. McVEY: No, Your Honor, there is no actual cash for that. We were just asking for a money judgment on that based upon what Sherman King testified to that he was told by defendant Hughes that defendant Hughes had thrown that out so the police would not get it the day of the search.

THE COURT: I'm going to — I'm not going to find that by a preponderance of the evidence. I don't think that's more likely true than not. So, I refuse to forfeit that speculative amount of money which may or may not have been thrown out the window.

(Tr. Forf. Hrng., # 392, at 8-11.)  In the Preliminary Order of

34

Forfeiture, Judge Goodwin entered judgment against Nathan J. Hughes in the amount of $200.  (Order entered April 25, 2005, # 343, at 2.)

At Defendant's sentencing hearing on April 25, 2005, Mr. Dascoli addressed the government's lack of evidence of Defendant's involvement in the conspiracy.  He pointed out that Sherman King admitted that he <u>overheard</u> that Defendant panicked and threw money and ounces of cocaine out when he learned of a federal search warrant.  (Tr. Disp. Hrng., # 406, at 6.)  He asserted that the amounts of cocaine in the PSR's Paragraph 10 "theoretically are reasonably foreseeable in connection with the criminal activity," but there is a "lack of nexus between Paragraph 9 and Paragraph 10 of the pre-sentence report."  <u>Id.</u>, at 7.  The court overruled the objection, and imposed a sentence of 140 months based on more than 47 kilograms of cocaine, which was the bottom of the applicable guideline range (Total Offense Level 29, Criminal History Category V, 140 to 175 months).  <u>Id.</u>, at 12-13.

Based on the foregoing, the undersigned proposes that the presiding District Judge **FIND** that Mr. Dascoli demonstrated effective assistance of counsel with respect to his objection to the quantity of cocaine used to determine Defendant's Base Offense Level.

<u>Ground four - Ineffective Assistance of Appellate Counsel</u>

Defendant was sentenced on April 25, 2005 (Judgment, # 350,

35

entered April 27, 2005).  On May 2, 2005, Mr. Dascoli filed a Notice of Appeal (# 365).

On July 12, 2005, the Fourth Circuit decided United States v. Collins, 415 F.3d 304 (4th Cir. 2005).  By Order entered August 15, 2005, the Fourth Circuit relieved Mr. Dascoli as counsel and appointed Jacqueline Hallinan as new counsel for Defendant (# 449).

Defendant contends that he was denied effective assistance of appellate counsel because Ms. Hallinan failed to argue the applicability of Collins to his case, resulting in substantial prejudice to him. (# 599, at 39.)   The state of the record when Ms. Hallinan assumed representation of Defendant was that (1) Mr. Dascoli had repeatedly objected to Defendant being sentenced on the total amount of cocaine attributed to the entire conspiracy in light of the holding in United States v. Booker, 543 U.S. 220 (2005), that any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts must be admitted by the defendant or proved to a jury beyond a reasonable doubt, (2) Judge Goodwin had ruled that Defendant would forfeit only $200, based on a one-gram sale, although he had sentenced him based on 47 kilograms, (3) the kingpin of the drug conspiracy had exculpated Defendant in writing and under oath, and (4) Collins had been decided, mandating a jury finding as to the amount of drugs attributable to a particular defendant in a drug conspiracy.

After a few delays in the briefing schedule, the brief of appellant was filed on December 22, 2005, raising two issues relating to Nathan Hughes: whether the District Court erred in denying Appellant Hughes' motion for acquittal on Count One of the Indictment (insufficient evidence based on lack of credibility of the witnesses); and whether the District Court erred in denying Appellant Hughes' motion to exclude the tape recording of the one-gram controlled buy due to the sexual banter on the tape.  United States v. Hughes, No. 05-4499, 2005 WL 3691235 at *1 (4th Cir.). The Collins case was not cited in the brief, and no argument was made that Defendant's Sixth Amendment right to trial by jury was violated by imposition of a sentence based on a quantity of cocaine not determined by the jury as attributable to him.  Id., at **20-22.  No argument was made that he was sentenced in violation of Booker.  No effort was made to file a motion for new trial based on Kirt King's exoneration of Defendant.

It is well-settled that a defendant has the right to effective assistance of counsel on direct appeal of a criminal conviction. Evitts v. Lucey, 469 U.S. 387, 396 (1985).  The standard applied to appellate counsel is the same as for trial counsel, as set forth in Strickland v. Washington, 466 U.S. 668 (1984).  That is, the defendant must demonstrate that his "counsel's representation fell below an objective standard of reasonableness" in light of the prevailing professional norms, id., at 688, and that "there is a

37

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id., at 694.   The Fourth Circuit, in a habeas corpus case, has directed that "reviewing courts must accord appellate counsel the 'presumption that he decided which issues were most likely to afford relief on appeal.' *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993)."   <u>Bell v. Jarvis</u>, 236 F.3d 149, 164 (4th Cir. 2000).   The Supreme Court wrote, in <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000), that "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent.   See, *e.g. Gray v. Greer*, 800 F.2d 644, 646 (C.A. 7 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome")."

In <u>Collins</u>, the Fourth Circuit applied principles from <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), <u>United States v. Irvin</u>, 2 F.3d 72 (4th Cir. 1993), and <u>United States v. Promise</u>, 255 F.3d 150 (4th Cir. 2001):

> *Apprendi* and *Promise* altered *Irvin's* holding by effectively replacing the words "a district court" with "the jury," and requiring proof beyond a reasonable doubt.   Although *Apprendi* modified *Irvin* in this manner, *Irvin's* holding that *Pinkerton [v. United States,* 328 U.S. 640 (1946)] principles should be used to determine, for sentencing purposes, the amount of narcotics attributable to any one individual in a conspiracy, remains good law.   Under current precedent, rather than the district court applying *Pinkerton* principles when determining the appropriate sentence under § 841(b), that same court must instead instruct a jury to use *Pinkerton*

38

> principles when making the same determination.  This is
> what the district court failed to do.
>
> By failing to instruct the jury in a manner
> consistent with our holding in *Irvin* (*i.e.* that, for
> purposes of setting a specific threshold drug quantity
> under § 841(b), the jury must determine what amount of
> cocaine base was attributable to Collins using *Pinkerton*
> principles), the district court's sentence effectively
> attributed to Collins, an individual member of the
> conspiracy, the quantity of cocaine base distributed by
> the entire conspiracy.  Because the district court
> adopted the jury's drug quantity determination in its
> application of the sentencing guidelines, the error
> affected both the threshold statutory range under §
> 841(b) and the district court's application of the
> guidelines.  For these reasons, the district court's
> *sentence*, which was based on the 10 year minimum set
> forth in § 841(b)(1)(A), cannot stand.

415 F.3d at 314. [Emphasis in the original.]  The Court then

considered the appropriate remedy for the faulty jury instructions

which resulted in an erroneous sentence, and determined to withhold

judgment as to the conspiracy count for thirty days.  Id., at 315.

During that period, the government could elect to have Collins re-

sentenced under the default penalty provision (less than five grams

of cocaine base), or to request that the Court reverse Collins's

conspiracy conviction and remand for a new trial.  Id.

The undersigned has reviewed the docket sheet in the Eastern

District of Virginia for the Collins case.  Collins was originally

sentenced to serve 151 months on two counts, to run concurrently.

That is, he was sentenced to less than the maximum for distribution

of less than five grams of cocaine base.  His sentence post appeal

was 66 months on both counts, to run concurrently, which is less

than the mandatory minimum of the offense of which he was convicted (conspiracy to distribute more than 50 grams of cocaine base). The Fourth Circuit's conclusion in <u>Collins</u>, that "the error affected both the threshold statutory range under § 841(b) and the district court's application of the guidelines," strongly indicates that a court must review both § 841(b) and the Sentencing Guidelines when assessing whether a <u>Collins</u> error affected the outcome of the proceedings.

The response of the United States to Defendant's ground for relief is incompetent. Although Defendant correctly cited to the published (Ronald) <u>Collins</u> case at 415 F.3d 304, the government's response refers to the unpublished (Winston Leonard) <u>Collins</u> case, found in the table at 68 F.3d 461 (4th Cir. 1995), a two-page decision which addressed a guidelines miscalculation and the Ex Post Facto Clause. The response will be disregarded.

The pertinent instructions given to the jury in Defendant's case were read to the jury as follows:

> Count One charges the defendants Kirt King, Nathan Hughes, Dane Mason, and others, named and unnamed, with conspiracy to violate 21, United States Code, Section 841(a)(1), that is, a conspiracy to knowingly and intentionally distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine, in violation of 21, United States Code, Section 846.

> * * *

> To sustain its burden of proof in connection with Count One, the conspiracy count, the Government must prove four essential elements beyond a reasonable doubt as to each defendant charged.

One, they have to prove that there was an agreement or mutual understanding knowingly made and knowingly entered into by two or more persons to violate the law, that is, to distribute cocaine, a controlled substance.

Second, the Government has to prove beyond a reasonable doubt that this conspiracy, agreement, or understanding was entered into by two or more persons.

Then they have to prove as to each defendant that you consider that at some time during the life of this agreement or understanding that defendant you are considering, Mr. Kirt King, Mr. Nathan Hughes, or Mr. Dane Mason, considered individually that is, knew the purpose of this understanding or agreement and deliberately joined in the conspiracy, agreement, or understanding.

Finally, the Government has to prove beyond a reasonable doubt that the actions of these co-conspirators in furtherance of the conspiracy were interdependent.

A criminal conspiracy is an agreement or mutual understanding knowingly made or knowingly entered into by at lest two people to violate the law by some common or joint plan or, or course of conduct. The evidence need not show that the alleged members of the conspiracy entered into any express or formal agreements or that they directly stated between themselves the detail of the scheme or its object or purpose or the precise means by which the object or purposes were to be accomplished, or that the alleged conspirators actually succeeded.

Interdependence among the conspirators is established when activities of alleged co-conspirators in one aspect of the charged scheme, in this case the alleged distribution of more than 500 grams of cocaine, are necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole.

* * *

A conspiracy, once formed, continues to exist until, one, it has accomplished its manifest purpose and objects or, two, it is terminated by the withdrawal of the members of the conspiracy, evidenced by a clear showing

of the intent of the conspirators to withdraw and no longer be a part of the conspiracy.

If you find beyond a reasonable doubt from the evidence in this case that a conspiracy existed and that the defendant that you're considering was a member of that conspiracy, then that defendant is bound by and responsible for the acts and statements of every other member of the conspiracy made in furtherance of the unlawful scheme.

* * *

In determining whether a defendant was a member of an alleged conspiracy, you should consider only that evidence, if any, pertaining to his own acts and statements. He's not responsible for the acts or declarations of other alleged participants until it is established, first, that a conspiracy existed and, second, from evidence of his own acts or statements that the defendant was one of its members.

On the other hand, if and when it does appear beyond a reasonable doubt from the evidence in the case that a conspiracy did exist as charged, and that the defendant under consideration was one of its members, then the statements and acts knowingly made and done during such conspiracy and in furtherance of its objects by any other proven member of the conspiracy may be considered by the jury as evidence against the defendant under consideration, even though he was not present to hear the statement made or to see the act done.

This is true because, as stated earlier, a conspiracy is a kind of partnership, so that under the law each member is bound by and responsible for the acts and statements of each and every other member made in pursuance of that unlawful scheme.

* * *

The evidence in the case for Count One need not establish a specific amount of, or quantity of a controlled substance, that is, the cocaine, but must establish that the defendants intentionally conspired to distribute 500 grams or more as charged in Count One of the superseding indictment.

\* \* \*

      In Count One of the superseding indictment, the defendants are charged with conspiracy to knowingly and intentionally distribute more than 500 grams of cocaine. The indictment identifies other persons both known and unknown to the grand jury. It is not necessary that you find that one or all of the defendants conspired with each of the persons identified in the indictment. You need only find that such a conspiracy existed between two or more persons, and that each individual defendant joined that conspiracy and was a member of it.

\* \* \*

(Tr. Trial, # 306, at 68-75.) At the conclusion of the instructions, at a bench conference, Mr. Dascoli requested that the amount of more than 500 grams be included as an element of Count One. Id., at 85-86. Judge Goodwin overruled the objection. Id., at 86. Mr. Dascoli renewed the objection concerning more than 500 grams being an essential element upon learning that the written instructions were going to the jury room, and it was overruled again. Id., 88-89.

The verdict form as to Defendant's charge in Count One, was read aloud as follows: "As to the charge of conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine in violation of 21, U.S.C., Section 846 as contained in Count One of the superseding indictment, we, the jury, find the defendant, Nathan J. Hughes, guilty." Id., at 95.

The court will address the prejudice prong of the Strickland standard first. That is, given that Defendant went to trial before

43

<u>Collins</u> was decided, and his conviction and sentence were affirmed one year after <u>Collins</u> was decided, is there a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different?

In <u>United States v. Foster</u>, 507 F.3d 233 (4th Cir. 2007), the (pre-Collins) jury was instructed to determine the amount of crack cocaine "involved in the conspiracy." <u>Id.</u>, at 242, 249. The verdict form asked the jury to determine the amount of crack cocaine "attributable to the conspiracy." <u>Id.</u>, at 249. The jury found that the conspiracy involved fifty or more grams of crack, and the sentencing judge found that each defendant was responsible for more than fifty grams of crack. <u>Id.</u> As in Defendant's case, the jury in <u>Foster</u> did not determine the individualized quantity of crack attributable to each defendant for the penalty purposes of § 841(b). The Fourth Circuit, reviewing under the three-prong plain error standard of <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993), found the first two prongs (error and plainness) to be satisfied. As to the third prong of <u>Olano</u>, whether the plain error affected the defendant's substantial rights, *i.e.* whether the error "affected the outcome of the district court proceedings," <u>id.</u>, at 734, the Fourth Circuit examined the life sentences imposed on each defendant. Two of the defendants received life sentences on counts other than the drug conspiracy; thus their substantial rights were not affected by the <u>Collins</u> error. Defendant Foster's substantial

rights were affected because his life sentence exceeded the twenty-year statutory default maximum sentence. <u>Foster</u>, 507 F.3d at 251-52. The Fourth Circuit chose not to notice the error because there was "overwhelming and essentially uncontroverted" evidence that Foster was responsible for more than fifty grams of crack, and that he was a major player in the distribution of crack. The court concluded that if the jury had been properly instructed per <u>Collins</u>, "the government's overwhelming evidence of the substantial quantities of crack reasonably foreseeable to Foster would have set the maximum sentence at life imprisonment." <u>Id.</u>, at 252.

In <u>United States v. Brooks</u>, 524 F.3d 549, 553-54 (4th Cir. 2008), the (pre-<u>Collins</u>) jury was instructed, over the defendants' objections, that it was obliged to find "not the amount a single defendant may have been involved with, but rather the amount of controlled substances involved in the conspiracy as a whole." The jury completed the verdict form, which read as follows: "We unanimously find that the amount and type of drugs involved in the conspiracy as a whole were as follows, 50 grams or more of crack cocaine and less than 500 grams of cocaine." <u>Id.</u>, at 554. The Fourth Circuit differentiated between <u>Collins</u> and <u>Booker</u>.

> *Collins* addressed and explained how a jury is to determine the threshold quantity of drugs attributable to an individual drug conspiracy defendant for the purpose of establishing the applicable *statutory* sentencing range under § 841(b). *Booker*, on the other hand, is solely a Sentencing Guidelines case. The *Collins* decision does not relate in any manner or way to the calculation or consideration of a defendant's Guidelines range, but

instead explains and instructs how the applicable penalty subsection of § 841(b) is to be determined for an individual conspiracy defendant.

Id., at 560. [Emphasis in the original.] The Fourth Circuit ruled:

It is clear from *Booker*'s express reaffirmance of *Apprendi* that for statutory penalty purposes the *threshold* quantity of drugs continues to be a fact that a jury must find beyond a reasonable doubt as to each individual defendant. As a result, a jury is still obligated, post-*Booker*, to apply *Pinkerton* principles to determine the threshold drug quantity attributable to each individual defendant convicted under § 846, for the purpose of establishing the applicable *statutory* range under § 841(b). [FN20]

[FN20. Importantly *Collins* commits to the jury the issue of threshold drug quantity for *statutory* purposes only. It does not require a jury to determine any drug quantities that may be attributable to a § 846 defendant for Sentencing Guidelines purposes. Thus, *Collins* does not impact the way defendant's Sentencing Guidelines range is either calculated or considered. Although a sentencing court is free to calculate the advisory Guidelines range using facts that it finds by a preponderance of the evidence, including individualized drug quantities, it must do so within the confines of the applicable statutory range. For example, if a properly instructed jury determines the quantity of crack attributable to a § 846 defendant to be 5 grams or more, the sentencing court would be free to find, by a preponderance of the evidence, additional drug quantities for use in determining that defendant's advisory Guidelines range. And, it would be permissible for such drug quantities to exceed the 5 grams already found by the jury. The only limitation on the court's drug quantity finding would be that the resulting sentence is circumscribed by the statutory maximum of 40 years (and minimum of 5 years), which was fixed by the jury's threshold drug quantity find. *See* § 841(b)(1)(B); *Collins*, 415 F.3d at 314.

46

_Id._, at 560.  As to one of the defendants, Mathis, the Fourth Circuit concluded that the _Collins_ error affected his substantial rights because his 360 month sentence exceeded the 20 year maximum established by § 841(b)(1)(C).  _Id._, at 561.

The Fourth Circuit has decided several cases which are not published, with varying results.

In _United States v. Mitre_, No. 05-5008, 209 Fed. Appx. 249 (4th Cir. Dec. 8, 2006), the court indicated that _Collins_ error occurred, but that it did not affect the defendant's substantial rights because her sentence (of 120 months) was within the statutory range applicable to the default drug amount (zero to twenty years, pursuant to 21 U.S.C. § 841(b)(1)(C).  _Id._, at **3.

In _United States v. Harris_, No. 03-4297, 215 Fed. Appx. 262 (4th Cir. Jan. 31, 2007), a 2002 jury convicted the defendant of conspiracy to possess with the intent to distribute five kilograms or more of a mixture containing an amount of cocaine, and other offenses.  The verdict form provided for the jury to make a finding regarding that amount of cocaine attributable to the entire conspiracy.  _Id._, at **13.  When Harris was sentenced, the Sentencing Guidelines were still mandatory.  The district judge imposed 210 months on the conspiracy conviction.  _Id._, at **4.  The Fourth Circuit found no _Apprendi_ error because his sentence was less than 20 years.  _Id._, at **14, n.10.  In its discussion of _Collins_, however, the court appeared to rely on the Sentencing

47

Guidelines, not the statutory terms of imprisonment, and then found

Booker error.

> Because the jury verdict form did not provide for
> the jury to make an individualized finding of the drug
> quantity attributable to Harris, the maximum penalty
> authorized by the jury verdict would ordinarily be the
> default penalty provision that applies when the amount of
> crack [sic; crack was not involved] cocaine attributable
> to a defendant is less than 5 [sic; 25] grams. 21
> U.S.C.A. § 841(b)(1)(C). *See United States v. Collins*,
> 415 F.3d 304, 314 (4th Cir. 2005). The base offense
> level for conspiracy to distribute 5 [sic; 25] grams of
> cocaine was 12. U.S. Sentencing Guidelines Manual §
> 2D1.1(c)(14). In this case, however, the jury found
> Harris guilty of possession with intent to distribute one
> kilogram of cocaine and of conspiracy to distribute
> cocaine, and the evidence that the kilogram of cocaine
> possessed by Harris was connected to the conspiracy was
> overwhelming. We therefore conclude that calculating a
> base level using a drug quantity of up to 1 kilogram
> (which would provide for a base offense level of 26)
> would not affect Harris's substantial rights. *See
> Promise*, 255 F.3d at 163. [Footnote omitted.] Because the
> district court, however, used the 5-15 kilogram range to
> assign Harris a base offense level of 32, and this
> resulted in a longer sentence than the maximum that would
> have been available under the Guidelines when using a
> base offense level of 26, the district court sentenced
> Harris in violation of his Sixth Amendment rights as
> articulated in *Booker*. [Footnote omitted.]

Id.

In United States v. Hambrick, No. 06-4114, 245 Fed. Appx. 288

(4th Cir. Aug. 3, 2007), a case which was tried in this District

before then-Chief Judge Faber, Ms. Hambrick was convicted by a jury

of engaging in a conspiracy to distribute 100 kilograms of

marijuana, exposing her to a sentence of not less than 5 years nor

more than 40 years, pursuant to 21 U.S.C. § 841(b)(1)(B). Although

Collins had been decided, the jury was not instructed to decide her

individual drug quantity culpability.  She was originally sentenced to the minimum mandatory 5 years.  The government conceded on appeal that the district court "erred in applying the mandatory minimum sentence of 60 months based upon the larger quantity of drugs attributable to the entire conspiracy rather than the quantity attributable to Hambrick individually."  245 Fed. Appx. at 294.  The case was remanded for resentencing consistent with Collins.  Although Ms. Hambrick was sentenced to a term within the default statutory provision, Collins error was found.

In United States v. Ferguson, No. 05-4460, 245 Fed. Appx. 233, 234 (4th Cir. Aug. 8, 2007), the (pre-Collins) jury convicted the defendant of money laundering and of engaging in a conspiracy to possess with intent to distribute at least 1,000 kilograms of marijuana, exposing him to a sentence of no less than 10 years and up to life imprisonment.  21 U.S.C. § 841(b)(1)(A).  He was originally sentenced to serve 235 months.  245 Fed. Appx. at 234.  The Fourth Circuit deemed the case to be indistinguishable from Collins, and withheld judgment on the marijuana conspiracy count for thirty days to allow the government to choose between a remand for re-sentencing under the 5 year maximum in § 841(b), or for a new trial.  Id., at 237.

The jury in Defendant's case found him guilty of engaging in a § 846 cocaine conspiracy, but did not determine the quantity of cocaine attributable to Defendant individually.  Based on Collins,

49

Foster, and other cases, if Ms. Hallinan had raised an issue of Collins error, the Fourth Circuit would have found that there was error and that it was plain.  The Fourth Circuit then would have determined whether the Collins error affected Defendant's substantial rights, that is, whether the error affected the outcome of the district court proceedings.  Unlike Foster and Brooks, it cannot be said that the evidence of Nathan Hughes' involvement in the conspiracy was "overwhelming."  Defendant's case is virtually indistinguishable from Collins.  There is a strong probability that if Ms. Hallinan had raised a Collins issue, that Defendant's appeal would have resulted in a remand for re-sentencing, with a significantly lower sentence being imposed.  Thus Defendant's substantial rights were affected and he has shown prejudice.

Having addressed the prejudice prong of Strickland, the undersigned turns to whether Ms. Hallinan's choice of appeal issues was outside the broad range of reasonable professional assistance of appellate counsel.  The American Bar Association's Standards for Criminal Justice, Prosecution and Defense Function, 3d ed., includes Defense Function Standard 4-8.3(b), which reads as follows:

> (b) Appellate counsel should give a client his or her best professional evaluation of the questions that might be presented on appeal.  Counsel, when inquiring into the case, should consider all issues that might affect the validity of the judgment of conviction and sentence, including any that might require initial presentation in a postconviction proceeding. * * *

Mr. Dascoli did an exceptional job of protecting Defendant's rights at trial, and at making a record for the purpose of appeal. While the undersigned has criticized him for not filing a second motion for new trial based on Kirt King's testimony exculpating Defendant, it is plain that Mr. Dascoli performed at a level well within the broad range of reasonable professional assistance. Presented with the record which Mr. Dascoli had carefully preserved, Ms. Hallinan could have simply performed elementary computer-assisted legal research of Fourth Circuit cases, looking for cases which included the search terms Apprendi, conspiracy, 841, and "drug quantity," and the Collins case should have been listed as a result. The undersigned can hardly imagine a more relevant case than one published by the Fourth Circuit, addressing drug quantity in the context of a conspiracy, within the year after Booker was decided. The undersigned proposes that the presiding District Judge **FIND** that Ms. Hallinan failed to present the strongest and best argument for Defendant to the Fourth Circuit, that her performance as appellate counsel was not within the wide range of professionally competent assistance, that Defendant suffered prejudice to his substantial rights as a result, and that he was denied effective assistance of appellate counsel.

### Recommendation

It is respectfully **RECOMMENDED** that the Section 2255 motion be

51

granted.

The parties are notified that this Proposed Findings and Recommendations is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(c) of the Federal Rules of Criminal Procedure, the parties shall have ten days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendations within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendations to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be served on the United States Attorney, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendations and to mail a copy of the same to Defendant and to counsel of record.

_____April 23, 2009_____
          Date

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge